Filed 10/7/15  Aguilera v. Lyons CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Plumas)

----

| | |
|---|---|
| ALFREDO M. AGUILERA et al.,<br><br>        Plaintiffs and Appellants,<br><br>    v.<br><br>JOAN LYONS et al.,<br><br>        Defendants and Respondents,<br><br>DAVID NORTON, as Referee, etc.<br><br>        Respondent. | C071061<br><br>(Super. Ct. No. 22149) |

Plaintiffs Alfredo M. Aguilera and Alicia M. Aguilera appeal from court orders entered after interlocutory judgment in their action for partition of real property (Code Civ. Proc., § 872.010 et seq.[1]) against co-owners, including respondents Joseph A. Kitterman and Kathleen C. Kitterman, as Trustees of the Kitterman Family Trust U.D.T. dated April 14, 1995 (Kittermans).[2]  (§ 904.1, subd. (a)(2), (9).)

_____

[1]  Undesignated statutory references are to the Code of Civil Procedure.

[2]  The Kittermans are the only named defendants who appeared in the action.  Other named defendants are Joan Lyons, Diane V. Friedlander, John D. Friedlander, Richard

1

Plaintiffs mainly challenge the trial court's orders confirming sale of the property and denying plaintiffs' motion to remove the referee, respondent David C. Norton. Plaintiffs contend: (1) a judge who recused herself improperly signed orders after the recusal; (2) the referee improperly used their lawyer; (3) the court erroneously confused private sale and public auction; (4) the referee failed to comply with statutory procedures; (5) there was a failure to market the property and a grossly inadequate sales price; and (6) the court should have granted plaintiffs' motion for relief under section 473 to submit a new appraisal.

The Kittermans filed in this court a motion for sanctions against plaintiffs and plaintiffs' attorney, Andrew W. Shalaby, for a frivolous appeal. (Cal. Rules of Court, rule 8.276.)

We affirm the court's orders, but deny the motion for sanctions.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 27, 2001, plaintiffs filed a complaint for partition and quiet title (§§ 872.230, 760.010 et seq.), alleging they owned 88/144 share of unimproved real property (the La Porte property) on or near the south shore of Little Grass Valley Lake in Plumas County, and defendants owned the rest in varying shares. The property is bisected by a county road and bears two AP (assessor parcel) numbers. The "Waterfront Parcel" is ten acres, zoned S-3 (suburban, three-acre minimum), with about 2,000 feet of lake frontage, and the "Hillside Parcel" is 76.60 acres, zoned GF (general forest, 80-acre minimum) located across the county road, to the south of the Waterfront Parcel.

---

M. Friedlander, Suzanne M. Studen, Lawrence M. McCune, Sally B. McCune, Howard Palmer, Grace Palmer, Howard Palmer, Jr., Vicky Palmer, Garth Donoviel, Penny Donoviel, Andrew Jennings, Susan Jennings, David Dolan, Mary Aileen Pyke, James Kitterman, Janet Yonash, Shirley (Calpestri) Craig (all living); and Jacketta Stinger, Jack Donoviel, John Dyer, Dorothy Dyer, William Gould, Mary Pyke, Anthony Kitterman, and John Bills, believed to be deceased, and their successors.

2

After a bench trial in June 2003, the court on August 21, 2003, issued an interlocutory judgment determining that plaintiffs are entitled to partition the property, and it was necessary for the court to appoint a referee to investigate and determine the possibility and economic feasibility of a division of the property, either by court order or otherwise, such that plaintiffs might be awarded a portion of the property, with the remainder sold and distributed among defendants. Plaintiffs were to advance any costs that could not be deferred. The court appointed David C. Norton as referee. The trial court retained jurisdiction over the terms and manner of any sale and disposition of the property.

The initial plan was to subdivide and sell the property, with plaintiffs undertaking the cost of subdivision.[3] Plaintiffs abandoned their subdivision efforts, because of cost and other difficulties, and they so informed their attorney, Peter Hentschel, in an email dated December 27, 2010.[4] On February 7, 2011, plaintiffs sent Mr. Hentschel a letter directing him and the referee to stop all work on the "division and/or sale of the LaPorte property." Plaintiffs further stated that "[a]ny work that you or David Norton may do after the date of our last email ordering a halt to all such work, dated December 26, 2010 [*sic*], in which we originally directed all work to be stopped, shall not to [*sic*] be done on our behalf and we will not be compensating you or David Norton for any such work in any way."

---

[3] A 2005 appraisal, submitted with plaintiffs' reply to their motion to set aside the sale, estimated a value of $1,090,000 to $1,350,000 but assumed the property would be subdivided.

[4] The December 27, 2010, email from Mrs. Aguilera to Mr. Hentschel reads in pertinent part: "After reviewing the last description of your billing dated 12-15-10, we feel we must stop all work being done on the LaPorte project. At this time we are in no position to continue to pay for a subdivision map which appears that it is going to take another couple of years to complete."

3

On March 3, 2011, Mr. Hentschel sent plaintiffs an email in which he indicated there had been additional discussion between plaintiffs and him about the prospect of selling the property and that payment of his fees and that of Norton's would be deferred until after the sale. He asked that plaintiffs let him know how they wanted him to proceed.[5]

On March 9, 2011, plaintiffs sent Mr. Hentschel an email which indicates they had authorized the effort to sell the property to continue, but that the sale would be contingent on them agreeing on the sale price and the terms of the sale.[6]

On March 10, 2011, Mr. Hentschel responded in an email, informing plaintiffs confirmation of the sale would be up to the court. He noted that plaintiffs had inquired whether they could simply stop the whole proceeding until the market recovers, but said with the judgment entered, he doubted whether dismissal was an option, and in any event he would not advise dismissal because it had cost around $8,000-$10,000 to determine, find, and serve everyone with an ownership interest, and they would have to start all over again if they could dismiss the case now and refile it later. He also noted that, although he was unsure, plaintiffs probably could not dismiss the case on their own motion at this

---

[5] The March 3, 2011, email from Mr. Hentschel to Mrs. Aguilera reads in pertinent part: "It was good to talk to you today. You asked me to confirm that Dave Norton and I would both be willing to defer payment of fees for any further time expended in exploring a sale of the property and would look to the sales proceeds for payment. I can confirm that I have talked to David Norton about that and both of us are willing to do so. As a practical matter, as we discussed this morning, it isn't going cost a great deal more to find out what kind of offers we might get. Please let me know as soon as possible how you want to proceed."

[6] The March 9, 2011, email from Mrs. Aguilera to Mr. Hentschel reads in pertinent part: "We would like to set a limit on any fees you and David Norton would be able to charge us. And of course any sale would have to be contingent on us agreeing to all monetary terms and any other terms of the sale."

4

stage.[7] Despite the March 2011 communications exchanged between Mr. Hentschel and plaintiffs indicating the sale was going forward, Mrs. Aguilera later stated in a declaration dated April 13, 2012, that Mr. Hentschel "secretly proceeded to obtain" the

_____

[7] The entire text of Mr. Hentschel's March 10, 2011, email to Mrs. Aguilera reads: "Alicia: [¶] Thank you for the note. Under the present court order, Dave Norton was authorized to pursue subdivision of the property subject to your agreement to pay the costs. As a consequence, with regard to the subdivision process, you had control over Dave's expenditures because you had agreed to be responsible for them. Now that the subdivision has been stopped, however, the court will probably want to revert to the only other legally recognized method of partitioning the property, which is to sell it and divide up the proceeds. In that process Dave Norton would be serving as the court's referee, and his fees will be determined by the court, not by us. However, those fees are not your personal responsibility. They are satisfied by a lien against the property, not a personal obligation of yours. [¶] In our last conversation you asked if there was a way to simply stop this whole proceeding until the market recovers. Unfortunately, the answer probably is 'no[.'] The court is under an obligation to get this matter resolved, and it isn't going to agree to table the whole situation until things improve, which could be years. I had indicated to you that you might be able to dismiss the case, but I'm not at all sure if that option is available to you. Once a judgment has been entered, as is true here, your right to unilaterally dismiss the case is limited. I haven't done any research on that question because I don't want to incur more fees, but it seems likely to me that the court is not going to permit a dismissal because the court has obligations to all the other owners to get the property sold and the proceeds divided and paid. My suggestion was and is to go forward with the process to the point of soliciting offers for the property. If you don't like the offers we can ask the court to reject them. If the court refuses, we are then back to the question of whether you can dismiss without the court's permission. In other words, we won't be in any worse situation than we are right now, and we will have the additional knowledge of what the market indicates the property is worth. [¶] As we discussed, there is another reason why I am resistant to dismissing the case, even if we have the right to do so. It cost somewhere around $8,000-$10,000 to determine all of the owners, establish their ownership interests, find them, serve them, and bring them under the court's jurisdiction. If we dismiss the case, we would have to start all over at some future time, except that the problem of finding and serving everyone would probably be considerably more complicated as older owners pass away. [¶] All of this is a long winded way of explaining that we have limited control over Dave Norton's future charges, since they are subject to the discretion of the court, not us, and also that we may not have an automatic 'veto power' over any offers that are made. We may or may not have the ability to dismiss the case over the court's objection."

5

trial court's order to sell the property after the February 2, 2011, letter in which they asked him to stop the sale process.

In April 2011, Mr. Hentschel copied plaintiffs on his email correspondence to the Kittermans about an amended judgment to change from "subdivision to sale of the entire property as one parcel." The record reflects no written response from plaintiffs.

On May 4, 2011, the trial court issued an amended interlocutory judgment, which amended the 2003 interlocutory judgment by directing the referee to proceed with partition by sale of the entire property, rather than partly by division and partly by sale. The amended judgment signed by Judge Hilde said, "The Property shall be partitioned by sale, and the Court finds and determines that a private sale, rather than a public auction, is more beneficial to the parties." The amended judgment appointed David Norton as referee to sell the property in accordance with section 873.510 et seq. The trial court again retained jurisdiction.

On May 23, 2011, the trial court issued a second amended interlocutory judgment, which repeated the substance of the amended interlocutory judgment but included a legal description of the property and was signed by assigned Judge John Darlington.[8]

The referee published a notice of sale, stating in part, "that on June 1, 2011, or as soon thereafter as one or more bona fide and acceptable offer(s) are made, [the referee] . . . will sell at private sale [the subject property]. The referee shall entertain offers for only the total property. The sale shall be for cash, and shall be subject to confirmation of the [trial court] . . . ." It was the referee's decision to demand cash.

---

[8] We recite the foregoing facts to explain the background. To the extent plaintiffs are unhappy with anything that happened in connection with the three interlocutory judgments, which were appealable judgments (§ 904.1, subd. (a)(9)), plaintiffs forfeited their contentions by failing to file timely appeals from those judgments (Cal. Rules of Court, rule 8.104 [appeal must be filed by earliest of 60 days after service of notice of entry of judgment or 180 days after entry of judgment]). The current notices of appeal were filed in April and June of 2012.

6

In June 2011, the referee received one offer. It was from Soper Company, for $465,000.[9]

In a letter dated December 12, 2011, Mr. Hentschel wrote plaintiffs that the engineer wanted payment from them for work he performed for the subdivision before they abandoned the subdivision effort. Mr. Hentschel stated his understanding that plaintiffs were going to pay that bill "and that Dave Norton and I would continue with required reports to the court and sales efforts, waiting on further payments for those services until either a sale or an improvement in your financial circumstances." Mr. Hentschel noted that hard economic times made it difficult to get a reasonable price for the property and suggested that, if plaintiffs wanted to keep the property until things improved, one possibility was for family or friends to buy out the other owners' interests in the property. "That would allow us to dismiss the court proceedings and cut off most of the continuing expenses."

On January 17, 2012, Mr. Hentschel sent an email to plaintiffs recounting his prior discussion with them about the referee continuing to solicit additional offers if plaintiffs brought the " 'pre-cutoff' " subdivision costs current. Mr. Hentschel said that, in further discussion, the referee was reluctant to delay more than a month or two out of concern that Soper may withdraw its offer. Mr. Hentschel said he was concerned that the referee would soon petition the court for instructions and would probably recommend that the court approve the Soper offer because there had been no other offers and the property had been on the market an extended time. Mr. Hentschel said he did not know what the court would do; plaintiffs' opinions would carry considerable weight since they own more than 60 percent of the property, but the court would also be aware that there were unpaid subdivision costs and referee fees and the uncertainty of how long it would take to get a

---

[9] The offer letter is dated June 17, 2010, but is an apparent typographical error because the letter refers to an information package received from the referee in June 2011.

7

better offer. Mr. Hentschel asked for plaintiffs' thoughts on how to proceed. He also said that it would be "greatly appreciated" if plaintiffs could make some payment on the $7,000 they owed him.

On January 18, 2012, plaintiffs sent Hentschel an email in which they told Hentschel he "better check with David Norton about your bills as all bills from you were sent to us by [him] and reimbursement was sent to him." They said Mr. Hentschel had stopped billing them directly in 2006 and had sent his bills directly to the referee and that they had promptly paid the bills when they were received. As for the offer, they made no objection to the prospect of a sale. Instead they wrote, "We have not seen an offer for the sale of La Porte - how can we approve any offer unless we know what the amount of the offer was?"

On January 20, 2012, plaintiffs on their own sent an ex parte letter to Judge Hilde saying they "would like to halt all proceedings concerning the sale of [their] property." They attached the February 7, 2011, letter to Mr. Hentschel in which they had previously directed him and the referee to stop all work on the "division and/or sale of the La Porte property." The letter was discussed by court and counsel at a case management conference on January 23, 2012. The minute order for that conference reads only, "Mr. Hentschel informs the Court that a petition is going to be filed requesting the Court confirm an offer on the property. The Court recalls the matter when a letter from Alfredo & Alicia Aguilera is presented. The matter is discussed with counsel who has no objection."

In an email dated January 25, 2012, Mr. Hentschel told plaintiffs that the referee was going to accept the Soper offer, which was for $465,000 cash. Mr. Hentschel explained the court process for confirmation of the sale and grounds to vacate the sale, and gave his opinion that there were no grounds to stop the sale with the possible exception that the sale price was disproportionate to the value of the property. Mr. Hentschel wrote: "You might want to give some thought to hiring an appraiser. If

8

the appraised value comes in at more than the Soper offered price, we would have a good argument for rejecting the sale and going back to more marketing efforts." Mr. Hentschel said the referee had agreed to wait until Hentschel returned from vacation before petitioning the court to approve the sale and predicted the confirmation hearing might be set on a day sometime in the middle to late March 2012. Mr. Hentschel said, "You have never responded to my suggestion that you might want to think about buying the property yourself. You own over 60% and consequently would only have to buy the 40% you don't own. Furthermore, the court would likely approve a credit sale for the 40%. In other words, the court would probably allow you to purchase the interests you don't own with a promissory note, rather than cash." Mr. Hentschel concluded the email by saying, "Please let me know your thoughts on all of this." The record reflects no written response from plaintiffs.

Also on January 25, 2012, the referee, having received no other offers, accepted Soper Company's June 17, 2011, offer, subject to the court's confirmation.

On March 8, 2012, the referee filed a motion to confirm sale of the property to Soper Company for $465,000, pursuant to section 873.730.[10] He filed an amended notice of motion on March 16, 2012. The hearing was noticed in the amended motion for April 23, 2012.

---

[10] Section 873.730 states in pertinent part: "(b) The court may confirm the sale notwithstanding a variance from the prescribed terms of sale if to do so will be beneficial to the parties and will not result in substantial prejudice to persons interested in the sale. [¶] (c) The court may vacate the sale and direct that a new sale be made if it determines any of the following: [¶] (1) The proceedings were unfair or notice of sale was not properly given. If there is no finding at the hearing of unfairness or improper notice, the sale may thereafter not be attacked on such grounds. [¶] (2) The sale price is disproportionate to the value of the property. [¶] (3) It appears that a new sale will yield a sum that exceeds the sale price by at least 10 percent on the first ten thousand dollars ($10,000) and 5 percent on the amount in excess thereof, determined after a reasonable allowance for the expenses of a new sale."

9

On March 12, 2012, plaintiffs filed a substitution of attorney, replacing their lawyer, Peter Hentschel, with Andrew Shalaby.

On April 9, 2012, plaintiffs filed an ex parte application for extension of time to serve opposition to the motion to confirm the sale and to file motions to terminate the sale and replace the referee, on the ground that plaintiffs' new attorney, Andrew Shalaby, had not yet received all files from former counsel. Mr. Shalaby attested the referee had improperly used plaintiffs' former lawyer, Peter Hentschel, to negotiate the transaction and file the motion to confirm the sale, against plaintiffs' instructions for Mr. Hentschel to oppose the sale on their behalf.

At a hearing on the ex parte application on April 10, 2012, Judge Janet Hilde noted a hearing had been scheduled for April 23rd on the motion to confirm the sale. She decided to recuse herself from any proceedings in which Mr. Hentschel's credibility would be in issue. Judge Hilde stated: "[A]bout 15 minutes ago, I got the opposition filed by Ms. Kitterman.[11] And it, in looking at the paperwork, let me just tell you my problem with hearing this matter, is that I often don't hear contested -- well, I don't hear contested issues that involved Peter Hentschel, as he's a personal friend, and I socialize with him. And when I looked at the application, it looked like there [were] some allegations against Mr. Hentschel. And in looking at the opposition, also, what I'm feeling is that I don't feel it's appropriate to vacate, or to continue the hearing that's on for the sale, but I no longer feel comfortable hearing your request, Mr. Shalaby, knowing that there's some underlying argument about Mr. Hentschel's representation on this matter. [¶] So what I've arranged, and I'm sorry you had to come all the way up here, I was expecting you to appear by phone, Ms. Kitterman, but the 19th, which is the next Thursday, we have a visiting Judge that can hear your ex-parte application. [¶] If it's

---

[11] Ms. Kitterman is counsel for and the daughter of Joseph Kitterman. Joseph Kitterman is Alicia Aguilera's brother and a trustee for the Kitterman trust.

10

granted, then whoever that visiting Judge is might continue the sale, but if he doesn't, I do have a visiting Judge also on the 23rd at 9:30, so we can keep that on, if need be.  [¶] So that's what the Court's intention is on this."

Ms. Kitterman queried whether Mr. Shalaby would be willing to waive his concerns regarding Mr. Hentschel, which led to the following:

"MR. SHALABY:  Well, I'll discuss, briefly, the matter.  Maybe we have a solution, I don't know.  [¶]  Yesterday, I got from Mr. Hentschel the correspondence file for the past ten years on this matter.  And as I read it, I came to the conclusion that Mr. Hentschel made all the right calls and made all the right recommendations and so forth.  And as I get into the part of the file from the year 2012, I see something went wrong, but I'm not sure what.  I can't quite figure -- there's no exchange of correspondence to give me an idea what happened.  I asked him, I left a message for him today, if I could meet with him and find out about that gap, to figure out if there's even a problem at all.  [¶]  What I would like to know, can we maybe, just briefly, continue everything to give me a chance to meet with Mr. Hentschel, and go over this file?  I just got it yesterday.  And maybe we'll be able to resolve everything.  As I said, from what I read, he sure looked like he made all the right calls for the many years -- he's been involved for over ten years, he worked pretty hard on this case.

"THE COURT:  Well, I'm not inclined to do that unless there was some stipulation.  That's why, I mean, I know that the sale was scheduled last month, I think, and now it's been continued at [the referee's] request, I believe, to the 23rd.  [¶]  So, unless there's a stipulation from Ms. Kitterman that, sure, we can vacate the trial and look at this.  If not, you know, then I'd rather have this ex-parte application be heard on the 19th.  Again, if it's denied, I still have the option of doing that on the 23rd.

"MR. SHALABY:  Well, maybe, I'll ask Ms. Kitterman if she'd stipulate to continuing it."

Ms. Kitterman declined to extend any dates, because according to her, Mr. Shalaby had delayed in getting the file and had then sent a barrage of unusual emails causing expense and distress.

There then followed:

"THE COURT: Okay. Um, well, again, Mr. Shalaby, you're indicating to me that, I assume you want to withdraw your comments against Mr. Hentschel. Do you want me to hear this today, or do you want to have this heard on the 19th in front of a visiting judge?

"MR. SHALABY: Well, if I could just be permitted to provide a piece of information to the Court and to Ms. Kitterman as well, and to Mr. Norton, and see if that would secure a stipulation before proceeding?

"THE COURT: Okay. I tell you what. Why don't you take ten minutes. . . ."

After a recess, the proceeding resumed:

"THE COURT: Okay. I'm assuming there's no resolution, or is there?

"MR. SHALABY: There's an issue that came up. Mr. Norton and I have discussed it, I don't know if your Honor would be willing to discuss it with us or not, but as far as the narrow issue of the hearing, what your Honor proposed, I think is probably what makes the most sense, which is the 19th with the visiting Judge, and the 23rd, I guess, it will be another visiting Judge?

"THE COURT: Right.

"MR. SHALABY: I think that that sounds like the right thing to do. But Mr. Norton and I were discussing whether we could discuss with your Honor if you will allow us to, your Honor, thoughts about the bigger part of this. [¶] The actual problem that we think may be resolvable, may not be resolvable, but that kind of looks more like a settlement discussion than a part of a hearing.

"THE COURT: Right. And I think at this late hour, I'm probably not willing to do that.

12

"MR. SHALABY: Right.

"THE COURT: Certainly, you can discuss that with Ms. Kitterman, if you want. But I think what I'm going to do is set this ex-parte . . . application [for the 19th]."

After court recessed, plaintiffs submitted to the court clerk a unilateral request for dismissal of the case without prejudice, which the court clerk filed although not statutorily authorized to do so. As we discuss in more detail *post*, a matter may not be dismissed without prejudice by a plaintiff after the trial has commenced. (§ 581, subd. (b); see fn. 20, *post*.) Only the trial court -- upon a showing of good cause -- can grant a dismissal without prejudice after commencement of the trial, unless all the parties consent. (§ 581, subd. (e); see fn. 24, *post*.) Trial had commenced and indeed concluded in 2003, as reflected in the interlocutory judgments.

Mr. Shalaby sent the Kittermans an email informing defendants of the dismissal. After learning of the illegal dismissal, Ms. Kitterman spoke with the court clerk, who realized her error in filing the dismissal and indicated the mistake would be corrected.

The following day, April 11, 2012, the trial court filed a minute order signed by Judge Hilde, stating, "An Interlocutory Judgment having been filed August 21, 2003, the Court hereby vacates the Request for Dismissal of Entire Action filed April 10, 2012."

On April 13, 2012, plaintiffs filed a motion to set aside the sale, on the grounds that: (1) the sale was outside the scope of the complaint and violates federal due process; (2) Mr. Hentschel, plaintiffs' former attorney, was employed by the referee and prepared the substantive documents for confirmation of sale against plaintiffs' instructions and in violation of section 873.120 (which says the same lawyer should not represent the referee and a party without written consent); (3) Mr. Hentschel prepared and filed the May 23, 2011, second amended interlocutory judgment on behalf of the referee, without plaintiffs' authority/knowledge/consent and against plaintiffs' written instructions; (4) the sale was inconsistent with the objectives of the lawsuit; (5) Mr. Hentschel and his "friend," referee Norton, obtained an improper and unauthorized order for sale of the property so they

13

could collect fees; and (6) the referee should be removed because he acted improperly with the aid of plaintiffs' own lawyer to sell the property against plaintiffs' wishes. Plaintiffs' memorandum of points and authorities asserted that they want to buy the property themselves at the $465,000 contract price.

The Kittermans filed an opposition to plaintiffs' motion to set aside the sale, stating plaintiffs failed to establish grounds to vacate the sale under section 873.730, subdivision (c). (See fn. 10, *ante*.) Responding to plaintiffs' points, the opposition said: (1) there was no due process violation because section 873.640 requires notice only to parties who have appeared in the action, and the referee did send notice to all parties who had appeared; (2) even if there was a violation in plaintiffs' former lawyer doing work for the referee's motion to confirm the sale, it would be unjust to the other owners to allow such a "mere technicality" to overturn the sale; (3) plaintiffs were "copied" on emails about the amended interlocutory judgments, and the exhibits to plaintiffs' motion showed plaintiffs were well aware of the proceedings but were merely unhappy about the price; (4) the sale is consistent with the objectives of the action and is required by the amended interlocutory judgment; (5) the sale was at plaintiffs' request because they decided to sell the property rather than continue with a difficult and costly subdivision; (6) removal of the referee was unjustified and could harm all property owners by incurring additional cost and delay; and (7) plaintiffs' claim that the sale price is inadequate is refuted by their assertion that they want to buy the property themselves at the same price.

On April 17, 2012, the referee submitted an ex parte application asking for court authority to hire an attorney, and Judge Hilde signed the ex parte order granting authority on the same day.

On April 18, 2012, the referee filed an opposition to plaintiffs' motion to set aside the sale. The referee submitted documents showing he sent plaintiffs bills for the legal work Hentschel did for the referee, and plaintiffs paid those bills. The referee cited his own expertise and marketing efforts and his opinion that the sale price was fair. He

14

further asserted that plaintiffs could not belatedly direct the referee to stop his efforts to sell the property, and plaintiffs had the right to bid a higher price at the confirmation hearing under section 873.740.[12]

On April 19, 2012, visiting Judge Thomas Kelly denied the ex parte application for extension of time.

Also on April 19, 2012, plaintiffs filed a motion to replace the referee. Mr. Shalaby submitted a declaration that stated: "I spoke with Mr. Pete Hentschel and Mr. Norton, the referee, in March of 2012 and was told by both that they had been close friends for decades, and further, that Mr. Hentschel had performed various legal services for Mr. Norton in relation to this legal matter, hence in violation of California Code of Civil Procedure [section] 873.120." Plaintiffs argued the referee had used Hentschel, who had not acted in plaintiffs' best interests and had ignored their instructions to avoid efforts to sell the property.

On April 23 and 24, 2012, a hearing was held before visiting Judge Thomas Warriner which, by stipulation of all parties, covered not only the referee's motion to confirm the sale, scheduled for April 23rd, but also plaintiffs' motions to remove the referee and set aside the sale, which had been scheduled for May.[13] There was

---

[12] Section 873.740, subdivision (a), states: "If at the hearing under Section 873.730 a responsible bidder makes a written increased offer that exceeds the sale price by at least 10 percent on the first ten thousand dollars ($10,000) and 5 percent on the amount in excess thereof, the court in its discretion may do either of the following: [¶] (1) Vacate the sale and direct that a new sale be made. [¶] (2) Vacate the sale, accept the increased offer, and confirm the sale to the offerer."

[13] Plaintiffs contend there was a fourth motion, to compel an accounting, but that was part of the motion to replace the referee. On appeal, plaintiffs claim that only the motion to remove the referee was heard and that, although all parties stipulated to have all motions heard at the same time, the judge got "confused" and "simply forgot" to hear the motion to confirm the sale. The transcript shows the "various motions" were submitted

15

discussion about the fact that the evidence for all three motions overlapped. The court said it made sense to decide the issue of removal of the referee first, because if the court removed the referee, it most likely would not approve the sale handled by that referee.

Mr. Shalaby argued plaintiffs would be "happy to buy" the property at the price of $465,000, which "is way too low," which led to the following:

"THE COURT: So your clients are willing to make a binding offer to buy the property for the amount in the sale today?

"MR. SHALABY: For more than that amount.

"THE COURT: I mean, they make that offer today as a fall-back position. They would pay not less than the amount of the current proposed sale.

"MR. SHALABY: They would definitely do that today. The only problem is they'd like to give notice to the others first. They'd like the other owners or --

"THE COURT: Well, no one cares if someone wants to pay more.

"MR. SHALABY: Well, there's another issue by the way which is the referee has come up with a condition that it has to be a no credit bid. . . . [¶] The consequence of no credit bids doesn't coincide with the code at all because the code says what the court sets in terms of the sale. The court never set the terms for the sale; the referee just came up with it. . . . [E]verybody out there who has notice . . . has notice that it has to be all cash. If my clients are going to pay more than 465, they may have to do it with a credit bid, in other words, paid over time or something like that.

"THE COURT: You mean that the estate would be the lender.

"MR. SHALABY: The 30 percent, yes, the 30 percent ownership because they have the 70 already."

---

at the same time. The two instances when the judge said he was confused related to poor form in Mr. Shalaby's questioning a witness, not confusion over what was at issue.

16

Mr. Shalaby added there was another problem, in that plaintiffs had offered to buy the Kittermans' interest for cash, and the Kittermans refused.

The referee's lawyer interjected that a credit sale would be problematic. The trial court agreed, stating, "When you have fractional interests of this sort, doing a time sale is a little bit complicated. Some peoples' payments on a monthly basis would be quite small."

The court heard testimony from Joseph and Kathleen Kitterman and some testimony from the referee and then recessed for lunch. When the afternoon session started, the court inquired about continuing the following morning and asked about logistics of participants who had travel considerations. The referee's lawyer said he was confused as to which motion they were on. The judge said, "Well, in my mind, I'm doing the May motion [to remove the referee] first because if I grant [it], then I'm not really likely to approve the sale. If I deny his May motion, then I move on to the sale issue."[14] The referee's lawyer noted the referee's motion to confirm the sale was on the schedule to be heard that day. The court said, "Right. The other alternative which didn't appeal to me was to postpone the sale motion until after the May motion, and so I thought I sensed in everybody a willingness to let's get the May motion done early and then we can decide the other motion because if I grant his motion, I'm not going to be real comfortable approving a sale -- [¶] . . . [¶] -- that was negotiated basically by somebody who I've removed." The court said, "[W]ith regard to the sale motion, I've got your stuff. I think I'm getting an understanding of it. I just need to know what I should do on [the motion to remove the referee]." Plaintiffs' lawyer indicated he did not have many more questions for the referee. The referee's lawyer said he had not yet put on his evidence supporting the motion to confirm the sale, though he could appreciate the court

---

[14] Actually, there were two motions scheduled for May -- plaintiffs' motions to remove the referee and to set aside the sale.

"wanting to rush through it . . . ." The court objected to "rush" and said it was more like "dispatch." The referee's lawyer said he would like to elicit testimony from the referee relevant to the motion to confirm the sale and "[l]ike I was talking about before, we have a lot of overlap." The court said, "[T]hat's why I got into this." The referee's lawyer said, "My understanding was we were going to hear all three, and that's kind of what I had prepared to do." The court said, "That's where I'm at." The Kittermans' lawyer said it was her understanding that if the court confirmed the sale, the motion to replace the referee would be moot. The court said that, for purposes of this discussion, he would not necessarily deny the motion to remove the referee. The court surmised that someone was concerned that delay might result in the buyer backing out. Plaintiffs' lawyer said he was not concerned about delay; the other parties expressed concern about delay. The court told everyone to "cogitate" until the following day.

The next morning began with an off the record discussion followed by resumption of the referee's testimony.

Norton testified he became a real estate broker around 1970, retired five years before testifying, and had 35-40 years of experience in the local real estate market. His marketing efforts for this property were "[c]ontacting by phone, email all the people . . . that I have dealt with, the successful brokers in the Sacramento Valley where most of the owners up at La Porte live. Those are secondary homes up at La Porte. They all have brothers and sisters and friends who might want another piece of property." He also contacted "my developer friends, engineers, architects, everybody who the small developer works for . . . ." Norton said he is aware of the Multiple Listing Service (MLS) but did not list this property on MLS because MLS "does not work in the remote properties that I deal with. It just is a waste of money, which is your client's money, and my system has worked for the last forty years. Very successfully." Norton did not advertise the property on the Internet, except on his own website. He did not place newspaper advertisements, other than the mandatory publication of notice, because it was

18

his experience that they do not work very well; persons who might be interested follow the public notices.

Norton was asked about the fact that someone else sold 12.55 acres for $495,000 in June 2011, with 1,440 feet of lake frontage. When asked to justify selling the subject property with 88 acres, which is seven times bigger, for the same price, the referee explained that the other land was worth more, because it had already been subdivided. The referee said the land that is the subject of this case would be worth much more, "a strong million bucks," if it were subdivided.

After the referee's testimony, the court asked if there were any other witnesses, and Mr. Shalaby said that he wanted plaintiffs to testify about not wanting to sell the property and to refute defendant's contention that Mrs. Aguilar's declarations reflected selected memory. The court said it had considered defendants' contention argument and then said, "So I would be correct in assuming that *the various motions now stand submitted*,[15] and do either of you, any counsel, desire to provide written arguments? Or if it's submitted, I'll take the files, go and read them, and send everyone a note." (Italics added.) The court added, "Do you want it to stand submitted based upon the materials in the file and the testimony I've heard *on the various motions*, or do you want to have an opportunity to submit further legal arguments?" (Italics added.) The referee's lawyer said he was prepared to submit. The Kittermans' lawyer asked to offer into evidence an email from Mr. Shalaby, instructing the Kittermans to use plaintiffs' former lawyer, Mr. Hentschel, to file for a continuance of the confirmation hearing. Mr. Shalaby said, "I'll just say it. That's what I did." The Kittermans' lawyer asked to submit the email, but the court said, "It's not considered as a big deal."

---

**15** On appeal, plaintiffs claim that only the motion to remove the referee was submitted.

After further discussion of exhibits, Mr. Shalaby said it appeared the property was put up for sale in order to pay pre-cutoff subdivision costs or maybe other costs. Mr. Shalaby said, "The reason [plaintiffs] are here today and what I wanted them to do, take the stand and then testify directly, was they didn't want to sell the property. All they wanted to do was build a home on the lakefront of the property. That's what they want to do today. They don't want to sell it, they want to build a home on the lake. [¶] And Mr. Hentschel, the former counsel, they told him in no uncertain terms, 'We don't want to sell the property. We don't want this to continue. We don't want a blank check on subdivisions. We just want to bring it all to an end. We're not made of money and we don't want to sell the property.' [¶] He ignored them and he went ahead and proceeded to obtain those judgments . . . , which Ms. Kitterman said that my clients knew all about, and I really would love it if they could take the stand and respond to that today. [¶] Yes, they received copies of email communications with attachments to them, but not a single one shows they ever responded saying we agree to any of this." Mr. Shalaby said it would be better for the court to hear it from plaintiffs directly. The court accepted counsel's representation as to what his clients would say. The court then allowed Mr. Shalaby to make representations concerning statements purportedly made by Mr. Hentschel and the referee about work Mr. Hentschel had done for the referee, all of which the trial court noted was reflected in the papers Mr. Shalaby had filed.

The trial court concluded the hearing by saying, "I do have a good grasp of the materials, and I will advise you all in writing after I've had a chance to further cogitate. I appreciate all of you bringing a very interesting case to me, rather more than I expected from my visit here. Thank you all."

The court issued a written order, dated April 24, 2012, labeled "RULING ON MOTIONS," which stated:

"This matter came on for hearing on Referee David Norton's Motion to Confirm Sale of Real Property. This Motion was opposed by Plaintiffs who asked that the sale be

20

set aside.  Plaintiffs also filed Motions to Compel Accounting and Replace Referee David Norton with Richard Osmondson.  Certain of Plaintiffs motions were initially scheduled to be heard on May 30, 2012.  By agreement of all counsel all motions were heard on April 24, 2012.

"The Court, after listening to testimony and considering the materials and arguments submitted by counsel rules as follows:

"1.  Plaintiffs' Motions to Compel Accounting and Replace Referee David Norton and to set aside the sale are denied.

"2.  Referee David Norton's Motion to Confirm Sale is granted."

On April 27, 2012, plaintiffs filed a notice of appeal from the orders confirming the sale and declining to remove the referee.

On May 4, 2012, plaintiffs filed a motion for new trial on the following grounds:

1.  Irregularity in proceedings, in that Judge Hilde after recusing herself filed a void order vacating plaintiffs' dismissal of the case.

2.  Irregularity in proceedings, in that the referee filed an improper ex parte application to hire counsel, and Judge Hilde having recused herself had no jurisdiction to sign the order, and the order failed to specify who shall pay for the lawyer, and it would violate procedural due process to have the lawyer's fees come out of the sale proceeds.

3.  Irregularity in proceedings, in that plaintiffs told everyone in late 2010 and early 2011 that they did not wish to sell the property, yet their lawyer Mr. Hentschel had "his friend" Judge Hilde sign the amended judgment in May 2011 without disclosing that the plaintiffs told him not to move for a sale.

4.  There was no hearing on the motions to confirm or set aside the sale; the hearing was only on the motion to remove the referee.  Plaintiffs claim they were deprived of the opportunity to bid on the property themselves.

5.  The notice of sale and notice of motion to confirm sale were procedurally defective.

21

6. The sale is unfair to plaintiffs and to all the named defendants, because defendants' proceeds will be very low or zero, and plaintiffs told other owners that the suit was abandoned, so they must be notified of any inconsistent course of action.

7. The sales price is grossly below market value, which plaintiffs expect to show by a new appraisal they have ordered and expect to produce before hearing on the motion for new trial.

The Kittermans filed an opposition to the motion for new trial, arguing:

1. Judge Hilde did not lose jurisdiction, and plaintiffs' lawyer himself asked Judge Hilde to stay on for possible settlement discussions.

2. Appointment of counsel for the referee was proper and in fact was necessitated by plaintiffs' meritless accusations against the referee.

3. Plaintiffs merely decided to stop attempts to subdivide the property, not to stop the sale, and the matter was already heard and plaintiffs fail to show any ground for new trial.

4. The hearing on April 23 and 24, 2012, was on all motions -- the motion to remove the referee, the motion to confirm the sale, and the motion to set aside the sale. The court merely started with the matter of removing the referee first, to which all parties agreed. If plaintiffs wanted to submit a bid at the hearing, nothing prevented them from doing so.

5. Of the two statutes cited by plaintiffs for their claim of procedural defects in the notice of sale and notice of motion, one statute does not exist (§ 650[16]), and the other (§ 640) says nothing about the matter.

_____

[16] This statute was repealed in 1945. (Stats. 1945, ch. 40, § 16.)

6. Plaintiffs do not have standing to complain about low proceeds for defendants, a point about which they are wrong anyway, and only parties who appear in the action need be notified (§ 873.640).

7. Plaintiffs cannot obtain a new trial by ordering a new appraisal after the court confirmed the sale, because section 657 allows for a new trial only when there is newly discovered evidence which could not, with reasonable diligence, have been discovered and produced at trial.

Before the hearing on the motion for new trial, plaintiffs on June 8, 2012, filed an ex parte application for relief from excusable neglect under section 473, which asked the court to set aside the April 2012 order confirming the sale and allow plaintiffs to submit a new appraisal dated May 28, 2012, received on June 5, 2012, on the grounds that plaintiffs were unable to obtain the new appraisal earlier and the new appraisal showed a property value of $785,000. Mr. Shalaby submitted his own declaration.[17] The declaration said the trial court denied his request for more time, and he did not have enough time to obtain a new appraisal before the April 23, 2012, hearing. Shalaby said the Kittermans' lawyer "correctly asserted that at one time I said I did not need the additional time, but that was prior to learning of the extent of the problems I was facing in this action." Shalaby further attested it was "not reasonably possible" to obtain a new appraisal before the April 23rd hearing. Shalaby said he found an appraiser on or about April 30, 2012.

The Kittermans and the referee filed oppositions to the section 473 motion.

On June 12, 2012, after a hearing, the trial court denied the motion for new trial and the motion for section 473 relief.

---

[17] The copy submitted in plaintiffs' appellants' appendix is not signed by Mr. Shalaby. We will assume for purposes of this appeal that he did sign the one he filed in court.

On June 29, 2012, plaintiffs filed a notice of appeal from the judgment, orders after judgment, and specifically denial of the motions for new trial and section 473 relief.

The Kittermans filed a motion for sanctions for a frivolous appeal. Norton filed a joinder which supports an award of sanctions to the Kittermans and reserves the referee's right to seek sanctions in the trial court.

## DISCUSSION

### I. Appealability

In their appellate briefing, plaintiffs list four matters (which actually encompass five items)[18] from which they are appealing:

(1) the April 11, 2012, order signed by Judge Hilde, vacating plaintiffs' unilateral dismissal of the lawsuit;

(2) the April 24, 2012, order confirming the sale;

(3) the April 24, 2012, order denying the motion to remove the referee; and

(4) the June 12, 2012, orders denying the motion for new trial and "related relief" under section 473.

These orders are appealable as orders made after an appealable judgment, i.e., the interlocutory judgment. (§ 904.1, subd. (a)(2) [appeal may be taken from order made after an appealable judgment], subd. (a)(9) [interlocutory judgment directing partition is an appealable judgment].)[19]

---

[18] Although plaintiffs' notices of appeal purport to appeal from a variety of matters, we need consider only those matters addressed in plaintiffs' opening brief on appeal. (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [reviewing court need consider only contentions adequately briefed].)

[19] After the order granting the motion to confirm the sale, the referee submitted a formal order (§ 873.750), but the trial court said its jurisdiction had been stayed by the notice of appeal.

24

Citing *Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, the Kittermans argue that this court does not have jurisdiction to hear an appeal from the order denying the motion for new trial, because an order denying a motion for new trial is not appealable but is reviewable on appeal from the underlying judgment. (*Id.* at p. 18.) The court in *Walker* held that an order denying a new trial is not "independently appealable" but may be reviewed only on appeal from the underlying judgment. (*Id*. at p. 19.) However, here, plaintiffs did file an appeal from the underlying judgment involving the appealable orders confirming the sale and declining to remove the referee. Accordingly, we will address the claims of error raised in this appeal.

## II. Standard of Review

Plaintiffs claim their contentions raise questions of law subject to de novo review, except the section 473 matter which they concede is subject to review for abuse of discretion. However, the statutes say the court "may" remove a referee (§ 873.010) and "may" confirm or vacate a sale (§ 873.730). Thus, the orders confirming the sale and declining to vacate the sale or remove the trustee are reviewed for abuse of discretion. Moreover, "although the action of partition is of statutory origin in this state, it is nonetheless an equitable proceeding [citations]." (*Elbert, Ltd. v. Federated etc. Properties* (1953) 120 Cal.App.2d 194, 200.) In a partition action, the proper standard of review is abuse of discretion. (*Zarrahy v. Zarrahy* (1988) 205 Cal.App.3d 1, 4-5.) "It must be remembered that a partition suit is in equity. [Citation.] A court of equity has broad powers and comparatively unlimited discretion to do equity without being bound by any strict rules of procedure." (*Richmond v. Dofflemyer* (1980) 105 Cal.App.3d 745, 766 (*Richmond*).) Unless a clear case of abuse of discretion is shown and unless there has been a miscarriage of justice, a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 331.) Plaintiffs, as appellants, have the burden to establish abuse of discretion. (*Ibid*.)

25

Moreover, plaintiffs must show prejudice to obtain a reversal. (Cal. Const., art. VI, § 13 ["No judgment shall be set aside, or new trial granted, in any cause, . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."]; § 475 [No judgment, decision, or decree shall be reversed or affected by reason of any error . . . or defect, unless . . . [it] was prejudicial."].)

### III. Orders Signed by Recused Judge

Plaintiffs argue that Judge Hilde's order vacating their dismissal is void because she had recused herself. Plaintiffs say they prefer the sale be vacated and the referee removed and another appointed, but request reversal of the order vacating the dismissal and reinstatement of the dismissal as a "last resort." In a footnote, plaintiffs complain Judge Hilde also signed the order authorizing the referee to hire a lawyer after she had recused herself. Plaintiffs have forfeited these contentions.

It is beyond dispute that plaintiffs' request to dismiss was improper and the court clerk erroneously filed the dismissal, because under section 581 the court clerk is only authorized to file a dismissal without prejudice at the plaintiff's request before trial has commenced,[20] and trial had long since commenced and concluded, as reflected in the interlocutory judgment. Without citing authority, plaintiffs claim the invalid dismissal could not be vacated without a proper noticed motion to determine if grounds existed to deem the interlocutory judgment void, as having been issued by a judge who would have

---

[20] Section 581 provides in part: "(b) An action may be dismissed in any of the following instances: [¶] (1) With or without prejudice, upon written request of the plaintiff to the clerk, filed with papers in the case, or by oral or written request to the court at any time *before the actual commencement of trial*, upon payment of the costs, if any. . . . [¶] (c) A plaintiff may dismiss his or her complaint, or any cause of action asserted in it, in its entirety, or as to any defendant or defendants, with or without prejudice *prior to the actual commencement of trial*." (Italics added.)

recused herself had she known the matter would end up contesting the credibility of plaintiffs' lawyer. Plaintiffs are wrong. Their dismissal was statutorily invalid because trial had commenced and concluded years before.

The question here is whether the trial court's order vacating the dismissal is void, because it was signed by Judge Hilde who had recused herself from the case the day before vacating the dismissal.[21] Section 170.3 provides in pertinent part: "(a)(1) If a judge determines himself or herself to be disqualified, the judge shall notify the presiding judge of the court of his or her recusal and shall not further participate in the proceeding, except as provided in Section 170.4, unless his or her disqualification is waived by the parties as provided in subdivision (b) [waiver must be signed by all parties and attorneys]. . . ." However, section 170.4 states in pertinent part: "(a) A disqualified judge, notwithstanding his or her disqualification may do any of the following: [¶] (1) Take any action or issue any order necessary to maintain the jurisdiction of the court pending the assignment of a judge not disqualified." Here, all that Judge Hilde did was to vacate plaintiffs' improper dismissal, thus preserving the trial court's jurisdiction -- an act authorized by section 170.4. Consequently, though not argued by the parties, the order vacating the dismissal is not void or even voidable.

Even if the order vacating dismissal was not authorized by section 170.4, plaintiffs have forfeited the issue by not objecting in the trial court to Judge Hilde's signing of the

---

[21] Norton argues Judge Hilde never recused herself as reflected by the fact that she never filed anything "officially" doing so. Rather, according to Norton, Judge Hilde left it up to the parties, who did not file a statutory disqualification statement. The Kittermans argue a judge's *refusal* to recuse herself can be challenged only by means of writ of mandate. (See § 170.3, subd. (d).) However, our reading of the record reveals that Judge Hilde did recuse herself from further contested proceedings and arranged to have the matter heard by a visiting judge. Since Judge Hilde did not *refuse* to recuse herself, and there was no objection in the trial court to the two orders signed by her, we see no basis for a writ of mandate.

27

order at a time when the matter could have been easily corrected by having a different judge consider the order. In *People v. Cowan* (2010) 50 Cal.4th 401 (*Cowan*), the judge, Judge Gildner, presiding over a jury trial in a criminal case realized during trial that his close friends were upcoming witnesses and relatives of one of the victims. (*Id*. at p. 454.) After recusing himself, the judge did not further participate in the case except to rule on, and deny without prejudice, the defendant's mistrial motion, and refer the case to another judge. (*Id*. at p. 455.) On appeal, the defendant argued the disqualification statute did not permit the disqualified judge to rule on the mistrial motion. Our Supreme Court said that, although the defendant did not waive disqualification, "defendant did not object to Judge Gildner's ruling on the motion or ask [the new judge] to reconsider Judge Gildner's ruling, even though Judge Gildner denied the motion 'without prejudice.' To the contrary, defendant affirmatively sought a ruling from Judge Gildner. Accordingly, defendant forfeited any claim that . . . section 170.3, subdivision (a)(1), prohibited Judge Gildner from ruling on the mistrial motion."[22] (*Id*. at pp. 454-455; see also *Andrisani v. Saugus Colony Limited* (1992) 8 Cal.App.4th 517, 525-526 [when party acquiesces to assumption of jurisdiction by disqualified judge, the party forfeits the right to raise the issue on appeal].)

Here, plaintiffs did not timely object in the trial court to Judge Hilde's signing the order vacating the dismissal. Instead, plaintiffs accepted the fact that the case was still ongoing by filing their motion to vacate the sale and failing to object to the order vacating dismissal. Plaintiffs did not challenge any orders signed by Judge Hilde as void or voidable -- until their motion for new trial, after Judge Warriner had issued his orders

---

[22]  The *Cowan* court went on to say that, because a mistrial was not required, any violation of the disqualification statute did not prejudice defendant. (*Cowan*, *supra*, 50 Cal.4th at p. 455, citing *People v. Watson* (1956) 46 Cal.2d 818, 836-837.) Because we find forfeiture, we need not address the question of harmless error.

28

granting the motion to confirm the sale, denying the motion to vacate the sale, and denying the motion to remove the referee.

As plaintiffs have said in their appellate briefing, they prefer that the sale be vacated and a new referee appointed, but request reversal of the order vacating dismissal as a "last resort." We discern the same motivation for failing to object to the order in the trial court. They did not challenge the trial court's order before further proceedings took place. Instead, plaintiffs rolled the dice in hopes of preventing the sale and replacing the referee in the trial court, when they could have raised the recusal issue before Judge Warriner. We will not allow plaintiffs to unroll their roll of the dice now that their gamble proved unlucky.

Citing *Christie v. City of El Centro* (2006) 135 Cal.App.4th 767 (*Christie*), plaintiffs argue we must conclude the order vacating the dismissal is void, because once a judge has recused herself, any further orders by the recused judge are void and have no effect. In *Christie*, the plaintiff peremptorily challenged a judge under section 170.6. The second judge assigned to the case granted nonsuit. However, prior to doing so, the second judge spoke with the disqualified judge about matters in the case unrelated to the nonsuit motion. Thereafter, the judge who granted the nonsuit was disqualified under former section 170.1, subdivision (a)(6)(C) (a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial). A motion for a new trial grounded on " 'irregularity in the proceedings' " was granted by a third judge because the judge who granted nonsuit had talked to the first judge and was disqualified for having done so. (*Id.* at pp. 773-775.) On appeal, the *Christie* court affirmed. Applying case law decided under former disqualification statutes, including a 1934 California Supreme Court case (*Giometti v. Etienne* (1934) 219 Cal. 687 (*Giometti*) [order granting review of a case was considered void because one of the justices who signed it did not realize his relative represented the petitioner]), the court in *Christie* held that the order issued by a

29

disqualified judge is void and will be set aside without determining whether the order was meritorious or whether the moving party was prejudiced. (*Christie*, at p. 776-777.)

However, the *Christie* court went on to say, "Although the California Supreme Court has never reconsidered its holding in *Giometti*, some Courts of Appeal have concluded that such orders are voidable, meaning they only must be vacated if the issue is properly raised by a party in the trial court, because the superior court itself, if not the disqualified judge, retains fundamental subject matter jurisdiction. [Citations.] Witkin has analyzed the issue and concludes that such orders are voidable, not void: 'Little is accomplished by calling the judgment of a disqualified judge "void." . . . The real question—the effect of the judgment—is evaded by the loose application of this word of many meanings. The problem is one of jurisdiction and, despite the fact that a disqualified judge totally lacks power to hear and determine the cause, the defect should not be considered a lack of jurisdiction of the subject matter . . . .' " (*Christie*, *supra*, 135 Cal.App.4th at pp. 779-780.) The court in *Christie* felt itself bound by the 1934 California Supreme Court decision in *Giometti* and held the order was void, but the *Christie* court went on to determine that, if the Supreme Court were to reconsider and hold such orders merely voidable rather than void, it would still invalidate the order. (*Id.* at p. 780.) *Christie* does not help plaintiffs in this case, because in *Christie* the plaintiff did not roll the dice like plaintiffs did here. The *Christie* plaintiff preserved the issue by filing a challenge for cause in the trial court and challenging the disqualified judge's orders immediately after finding out about the existence of grounds for disqualification. (*Id.* at pp. 772-773.)

Although the California Supreme Court has not expressly revisited *Giometti*, our high court did hold in *Cowan* that the defendant forfeited any challenge to rulings made by a disqualified judge where the defendant failed to object to the disqualified judge or ask the new judge to reconsider the disqualified judge's ruling. (*Cowan*, *supra*, 50 Cal.4th at p. 455.)

30

Accordingly, we conclude plaintiffs have forfeited any claim that section 170.3 prohibited Judge Hilde from signing the order vacating their improper dismissal.

In a footnote, plaintiffs complain Judge Hilde also signed the April 17, 2012, order authorizing the referee to hire a lawyer. We may disregard contentions perfunctorily asserted in a footnote without development. (*Placer Ranch Partners v. County of Placer* (2001) 91 Cal.App.4th 1336, 1343, fn. 9.) Even if we were to consider it, this contention would also fail for the reason that plaintiffs forfeited their challenge to a recused judge signing the order by failing to raise it in the trial court at the time it occurred.

Plaintiffs fail to show any grounds for reversal based on recusal of the judge.

### IV. Referee's Use of Plaintiffs' Attorney

Plaintiffs argue section 873.120 precluded the referee from employing an attorney who was representing a party to the action. Plaintiffs are right, but they have failed to show prejudice.

Section 873.120 provides: "(a) The referee may employ an attorney only with the approval of the court pursuant to Section 873.110. [¶] (b) The application for approval shall be in writing and shall include the name of the attorney whom the referee wishes to employ and the necessity for the employment. [¶] (c) *The attorney so employed may not be attorney for, or associated with or employed by an attorney for, any party to the action except with the written consent of all the parties to the action.* [¶] (d) Any claim for compensation for the attorney shall detail the services provided by the attorney." (Italics added.)

At oral argument, counsel for referee argued that the referee drafted everything other than the interlocutory judgment, to which there was a stipulation. Counsel focused primarily on the motion to confirm the sale, stating that the referee drafted that motion and just used Hentschel's office to put a cover sheet on it and to file it, and "that's what it comes down to." But as the referee acknowledged in the trial court and in his brief on appeal, he sent plaintiffs Hentschel's bill for "work related to 'amend the referee's report'

31

along with another invoice showing 'advise referee re legal aspects of partition[.'] " We also note an email in the record from Hentschel to Norton in which Norton provided legal advice concerning the procedure for sale required by the Code of Civil Procedure.[23] In his appellate briefing, Norton does not dispute Hentschel did legal work for him. He argues plaintiffs continued to pay Hentschel's bills, knowing that he was doing work for him as the appointed referee.

There was evidence that plaintiffs knew their lawyer, Mr. Hentschel, was doing legal work for the referee at the same time he was representing plaintiffs, but as plaintiffs point out, knowledge is not the same as legal consent. The statute requires "written consent," but there was no written consent here. Nor did the referee submit an application in writing asking for court approval. Thus, the referee violated section 873.120.

However, plaintiffs fail to show the trial court abused its discretion in determining not to remove the referee or vacate the sale on this ground (§§ 873.010, 873.730;

---

[23] In an email dated January 21, 2011 (attached to a supplemental declaration filed by Norton in the trial court), Hentschel wrote: "Dave: Here is the sale procedure as required by the Code of Civil Procedure. There is nothing in the code that allows the court to vary from or waive any part of the procedure: [¶] a. The court, on your recommendation, determines whether the sale is to be at 'public auction or private sale[.'] I have never seen a Plumas County court order a public auction, primarily because its such a small county and generally there are so few interested parties that public auction just isn't practical. So private sale is all but certain. [¶] b. Notice of sale must be given 'in the manner required for the sale of like property at an execution sale[.'] An execution sale requires that notice of the sale be published in the local paper and posted on the property (get out your snowmobile). The published and posted notice is required to state the date and place where bids will be received, etc. We followed this same procedure when we sold the H.M. Bradley properties some years ago. I'm sure you remember all of the details. [¶] c. Upon receipt of an acceptable offer, you, as referee, must petition the court for confirmation. The confirmation hearing follows the same general rules as a probate sale: the court must entertain overbids, if any, and can cancel the sale if the court feels that the price is inadequate, or if there is evidence that further exposure to the market will result in a higher price being offered."

32

*Richmond*, *supra*, 105 Cal.App.3d at p. 766 ["A court of equity has broad powers and comparatively unlimited discretion to do equity without being bound by any strict rules of procedure"]) or that plaintiffs were prejudiced. (Cal. Const., art. VI, § 13; § 475.)

The evidence showed plaintiffs knew what was going on and benefitted from the referee keeping costs down. Although plaintiffs insinuate Mr. Hentschel had a conflict that operated to their detriment when he failed to follow their wishes to shut the case down, plaintiffs overestimate their ability to control the lawsuit after the interlocutory judgment was entered. They had no authority to dismiss the lawsuit without prejudice. (§ 581.)[24] And Mr. Hentschel made suggestions for their benefit, e.g., buying out the other owners, suggesting that plaintiffs get an appraisal -- strategies plaintiffs either chose not to pursue or later pursued without success after substituting counsel.

Plaintiffs fail to show grounds for reversal based on the referee's use of Mr. Hentschel.

---

[24] See fn. 20, *ante*.

A dismissal without prejudice required the consent of the parties or the court's approval after a finding of good cause. Section 581, subdivision (e), provides: "After the actual commencement of trial, the court shall dismiss the complaint, or any causes of action asserted in it, in its entirety or as to any defendants, with prejudice, if the plaintiff requests a dismissal, unless all affected parties to the trial consent to dismissal without prejudice or by order of the court dismissing the same without prejudice on a showing of good cause." Thus, plaintiffs' ability to obtain a dismissal after the commencement of the trial was limited to a dismissal with prejudice. The trial court has the authority to grant a dismissal without prejudice upon a showing of good cause. Plaintiffs do not invoke this provision, do not provide any analysis or authority as to its application after entry of an interlocutory judgment, do not claim the bad economy would have constituted good cause, and do not claim that they would have pursued a dismissal (rather than delay) after realizing they would lose the benefit of funds they had already invested in the lawsuit.

## V. Confirmation of Sale

Plaintiffs make various arguments seeking to reverse the trial court's orders confirming the sale and denying plaintiffs' motion to set aside the sale. None of the arguments has merit.

Section 873.510 states: "The referee appointed by the court to make a sale of the property shall sell the property in the manner and following the procedures provided in this chapter." Upon making the sale, the referee shall make a report to the court. (§ 873.710.) The referee, any party, or the purchaser, may move the court to confirm or set aside the sale. (§ 873.720.)

Section 873.730 governs confirmation hearings and provides: "(a) At the hearing, the court shall examine the report and witnesses in relation to the report. [¶] (b) The court may confirm the sale notwithstanding a variance from the prescribed terms of sale if to do so will be beneficial to the parties and will not result in substantial prejudice to persons interested in the sale. [¶] (c) The court may vacate the sale and direct that a new sale be made if it determines any of the following: [¶] (1) The proceedings were unfair or notice of sale was not properly given. If there is no finding at the hearing of unfairness or improper notice, the sale may thereafter not be attacked on such grounds. [¶] (2) The sale price is disproportionate to the value of the property. [¶] (3) It appears that a new sale will yield a sum that exceeds the sale price by at least 10 percent on the first ten thousand dollars ($10,000) and 5 percent on the amount in excess thereof, determined after a reasonable allowance for the expenses of a new sale."

### A. Private Sale or Public Auction

Plaintiffs argue the trial court erroneously believed the applicable procedure was for a " 'public auction,' " yet the court "forgot" to hold a public auction. Plaintiffs fail to prove their point.

Section 873.520 provides: "The property shall be sold at public auction or private sale as the court determines will be more beneficial to the parties. For the purpose of

34

making this determination, the court may refer the matter to the referee and take into account the referee's report."

The first and second amended interlocutory judgments specified a private sale.[25] The publication of notice to the public also specified private sale.[26]

Plaintiffs claim that the referee's motion to confirm the sale "erroneously conveys that the sale [was] by public auction and will require 'Court approved over bid required by the statutes.' " However, we see nothing in the pages of the appellants' appendix cited by plaintiffs that says anything about public auction. Neither the notice of motion nor the amended notice of motion say anything about public auction. The language plaintiffs cite is actually from the referee's disclosure document executed by the purchaser -- "Any offer to purchase will be subject to Court confirmation of the sale and any Court approved over bid required by the statutes." Nothing in this document refers to public auction. The quoted language relates to section 873.730, subdivision (c)(3), which says that at the hearing to confirm the sale, the court may vacate the sale and direct a new sale if "[i]t appears that a new sale will yield a sum that exceeds the sale price by at least 10 percent on the first ten thousand dollars . . . and 5 percent on the amount in excess thereof . . . ." This statute is not limited to sales by public auction. If plaintiffs mean to suggest that the word "bid" in the disclosure statement necessarily means public auction, they cite no authority for any such proposition. We see no reason why a private seller could not receive multiple bids from prospective purchasers in a private sale.

---

[25] Both amended interlocutory judgments said: "The Property shall be partitioned by sale, and the Court finds and determines that a private sale, rather than a public auction, is more beneficial to the parties."

[26] The published notice reads in pertinent part: "David C. Norton, as duly appointed and acting referee . . . will sell at private sale certain real property . . . ."

35

In their reply brief, plaintiffs argue for the first time that the issue is not between private sale and "public auction," but between private sale and "public sale," meaning any sale that has been publicly advertised. Plaintiffs argue that the procedure carried out here was a "public sale," and thus the sale violated the court's order for a private sale. However, this is not the argument made in plaintiffs' opening brief, which specified " 'public auction.' " We disregard new points raised for the first time in a reply brief. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 763-766.)

## B. Compliance With Sale And Notice Procedures

Plaintiffs argue the trial court erred in confirming the sale, because the referee failed to comply with sale and notice procedures of section 873.600 et seq. in various respects. However, plaintiffs fail to show that any procedural defect caused them substantial prejudice warranting reversal of the order confirming the sale. Indeed, plaintiffs do not even discuss prejudice, a showing that is required to obtain reversal.

Section 873.730, subdivision (c), says the court "may" vacate the sale if it determines "[t]he proceedings were unfair or notice of sale was not properly given." The statute thus gives the trial court discretion. The trial court in this case determined there was no defect sufficient to set aside the sale. In order to obtain reversal of the trial court's decision, plaintiffs must show prejudice on appeal. (Cal. Const., art. VI, § 13; § 475.)

### 1. Credit Sale

Plaintiffs complain the published notice of sale said the sale must be for cash rather than credit, yet the referee never asked the court or the parties whether a sale on credit would be acceptable. Section 873.630 states: "The court may: [¶] (a) Direct a sale on credit for the property or any part thereof. [¶] (b) Prescribe such terms of credit as may be appropriate. [¶] (c) Approve or prescribe the terms of security to be taken upon the sale . . . ." Section 873.650 states: "The court shall prescribe the contents of the notice of sale . . . ."

36

Plaintiffs argue that they "made clear" at the April 23, 2012, hearing their desire to purchase the property, but they wanted their existing interest in the property to be deemed a credit.[27]  However, as we have seen, the record is not so clear.  Mr. Shalaby, told the court that plaintiffs would be "happy to buy" the property at the price of $465,000, which "is way too low," and they would be willing to offer more on contingencies of a credit sale.  Then, at the end of the hearing, plaintiffs' counsel said they do not want the property sold.

Thus, plaintiffs fail to show that they offered to buy the property, that they were willing and able to pay all cash, or that the trial court would have allowed a credit sale.  Instead, plaintiffs say they did not expressly reject the idea of paying all cash and were never given an opportunity to address the issue because the trial court never held a hearing to confirm the sale.  However, the motion to confirm the sale was scheduled for hearing that day, and section 873.740 says the court may direct a sale to a new bidder at the confirmation hearing if the new bidder submits "a written increased offer" that exceeds the sale price by at least 10 percent on the first $10,000, and five percent on the excess.  Plaintiffs submitted no such written bid at the hearing or at any other time.

## 2.  Sales Price

Plaintiffs next complain the published notice of sale did not mention the sale price.  Plaintiffs cite no authority requiring that the notice state a price.  They claim section 873.650, subdivision (a), does so, but it does not.  Section 873.650 provides:  "The court shall prescribe the contents of the notice of sale, which shall include a description of the property, the time and place of sale, and a statement of the principal terms of sale.  In place of the principal terms of sale, the notice may refer to an order of the court or to a written statement containing such information which may be inspected at the place of

---

[27]  Plaintiffs interest is about 65 to 70 percent.  The exact percentage is disputed but is not material to this appeal.

business of the referee or the referee's attorney." Subdivision (b) of section 873.650 provides that "[a] notice of private sale shall state a place *where bids or offers* will be received and a day on or after which the sale will be made." (Italics added.) Clearly, the statutory notice provisions leave open the prospect of bids or offers in unknown amounts being made by prospective buyers; yet there is no express provision requiring a set sales price be included in the notice. Thus, the notice of sale here is consistent with the statute. It said "[t]he referee shall entertain offers . . ." and indicated where "[w]ritten bids or offers" would be received.

Plaintiffs argue the notice must specify a price, because otherwise, someone who might want to submit an overbid at the confirmation hearing could not arrive at the hearing prepared to bid because they would not know how much had been offered. However, no statutory provision expressly requires a sales price to be stated in the notice. Once an offer is made and accepted, the price offered must be set forth in the report of the referee to confirm the sale. (§ 873.710, subd. (b)(3).) Here, the referee attached a copy of his report to his motions to confirm the sale, and the report contained the sale price to Soper. Thus, interested buyers had access to the amount on which they would need to overbid prior to the hearing.

Plaintiffs fail to show a violation of the statute. Even assuming a violation, plaintiffs have failed to show prejudice. The record demonstrates they knew the amount of the offer by the time of the hearing; thus, the lack of that information did not prevent them from making a written overbid.

### 3. Parcel Numbers

Plaintiffs claim the referee omitted one of the parcel numbers in the published notice of sale and got one of the parcel numbers wrong in the sales contract. However, our review of the record reveals that the published notice does contain both numbers. Although one reference in the sales agreement has a typographical error, there are other references in the sales agreement that are accurate.

Plaintiffs fail to show any variance warranting reversal. (§ 873.730, subd. (b) ["The court may confirm the sale notwithstanding a variance from the prescribed terms of sale if to do so will be beneficial to the parties and will not result in substantial prejudice to persons interested in the sale."].)

### 4. Dates

Plaintiffs say the published notice of sale incorrectly referred to the May 4, 2011, amended interlocutory judgment, instead of the May 23, 2011, second amended interlocutory judgment. However, the only difference was that the latter document expressly appended the legal description of the property. Plaintiffs nevertheless claim the publication was defective, because section 873.640 says notice of sale in a partition shall be given in the manner required for notice of sale of property upon execution (§ 701.520 et seq.), and section 701.540 mandates that notice of sale be published not less than 20 days before acceptance of offers. However, plaintiffs cite no authority supporting their position that such a technical defect would warrant reversal of the court order confirming the sale absent a showing of prejudice, and clearly no one was harmed in this case because anyone interested in making an offer had far more than 20 days to do so before the referee accepted Soper's offer in January 2012 -- several months after publication of notice.

### 5. Competitive Bids

Plaintiffs claim the published notice of sale precluded competitive bids by referring to a " 'private sale' " instead of a " 'public sale.' " Again, plaintiffs fail to show that bidders cannot compete in a private sale.

Elsewhere in their brief, plaintiffs claim a private sale in a partition action is not subject to confirmation by the court but is instead governed by section 873.710, which according to plaintiffs merely says that "[u]pon making a sale of property, the referee shall report the sale to the court." (§ 873.710, subd. (a).) However, subdivision (b)(8) of the same statute says the referee's report shall contain material facts relevant to the

39

confirmation proceeding, which implies a confirmation proceeding was contemplated by the Legislature.

We conclude plaintiffs fail to show any procedural defect warranting reversal.

### C.  Marketing the Property

Plaintiffs argue the trial court erred in confirming the sale, because marketing of the property was woefully lacking.

The Kittermans say this issue is subject to substantial evidence review.  They cite *East Shore Co. v. Richmond Belt Railway* (1916) 172 Cal. 174, 180, which applied substantial evidence review in a partition action, but pursuant to a former statute which said the court " 'must order a partition' " " 'upon the requisite proofs being made.' " (*Ibid.*)  Here, the statutes at issue give the trial court discretion whether to confirm the sale or remove the trustee, though certainly the state of the evidence is relevant to whether the trial court abused its discretion.

Norton testified he became a real estate broker around 1970, retired five years before testifying, and had 35-40 years of experience in the local real estate market.  His marketing efforts for this property were "[c]ontacting by phone, email all the people . . . that I have dealt with, the successful brokers in the Sacramento Valley where most of the owners up at La Porte live.  Those are secondary homes up at La Porte.  They all have brothers and sisters and friends who might want another piece of property."  He also contacted his "developer friends, engineers, architects, everybody who the small developer works for . . . ."  He was aware of the MLS but did not list this property on MLS because MLS "does not work in the remote properties that I deal with.  It just is a waste of money, which is your client's money, and my system has worked for the last forty years.  Very successfully."  Norton did not advertise the property on the Internet, except on his own website.  He did not place newspaper advertisements, other than the mandatory publication of notice, because it was his experience that they do not work very well; persons who might be interested follow the public notices.

40

Plaintiffs argue the marketing was inadequate because the referee did not list the property on MLS, did not do any newspaper advertising other than the required publication of notice, and did not list a sale price.

However, plaintiffs presented no evidence that a MLS listing is the sine qua non of adequate marketing and presented no evidence refuting Norton's explanations for his choices.[28] As to not listing a sale price, plaintiffs fail to show how this prejudiced them. Since they think the $465,000 offer is way too low, any listed price that would have satisfied plaintiffs might not have yielded any offers.

Plaintiffs fail to show grounds for reversal based on marketing efforts.

## D. Adequacy of Sales Price

Plaintiffs argue the sales price was disproportionate to the value of the property. They cite the referee's testimony that someone else sold 12.55 acres for $495,000 in June 2011, with 1,440 feet of lake frontage. However, when asked to justify selling this 88 acres of land, which is seven times bigger, for the same price, the referee explained that the other land was worth more, because it had already been subdivided. The referee said the land that is the subject of this case would be worth much more, "a strong million bucks" if it were subdivided.

Plaintiffs offered no evidence in rebuttal at the hearing in the trial court. Instead, they simply say on appeal that "[l]ogic compels reason here. The market value of a 'project' that required subdividing, but would be worth 'a strong million bucks' after subdividing, cannot reasonably be a mere $465,000." Yet, plaintiffs' own experience defeats their argument. The record shows that subdividing the property was so

---

[28] Plaintiffs' lawyer, Mr. Shalaby, said at the hearing that he is a real estate broker and MLS is realtors' biggest resource. However, this was argument, not evidence. At oral argument, Mr. Shalaby acknowledged that there was no expert testimony calling into question the adequacy of the referee's marketing efforts. The trial court did not abuse its discretion by finding Norton's marketing adequate.

problematic that plaintiffs abandoned the effort. In any event, plaintiffs' argument does not constitute evidence.

We conclude plaintiffs fail to show reversible error regarding the sale of the property.

## VI. Denial of Motion for Section 473 Relief

Plaintiffs challenge the trial court's order denying their section 473[29] motion for relief from excusable neglect, to allow plaintiffs to submit a new appraisal. However, when plaintiffs filed this section 473 motion on June 8, 2012, seeking to set aside the April 2012 orders confirming the sale and denying plaintiffs motion to set aside the sale, plaintiffs had already filed a notice of appeal from the April orders on April 27, 2012. A notice of appeal deprives a trial court of jurisdiction to hear a section 473 motion regarding the matter that is the subject of the appeal. (§ 916; *Elsea v. Saberi* (1992) 4 Cal.App.4th 625, 629; *Copley v. Copley* (1981) 126 Cal.App.3d 248, 298; *Beresh v. Sovereign Life Insurance Co*. (1979) 92 Cal.App.3d 547, 552.)

No one discusses this point in the context of the June 2012 motion. While this appeal was pending, plaintiffs filed in this court a motion for relief from appellate stay in order to pursue in the trial court a second section 473 motion on different grounds. Plaintiffs' motion in this court for relief from appellate stay argued appellate stay should not apply to section 473 motions but in any event relief from stay should be granted in order to pursue a different section 473 motion. This court denied the motion for relief from appellate stay with regard to the second section 473 motion.

---

[29] Section 473, subdivision (b), states: "The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect."

Since the trial court had no jurisdiction over the first section 473 motion, plaintiffs cannot show any prejudice in the trial court's order denying the section 473 motion.**30**

Moreover, plaintiffs failed to show any basis for section 473 relief. The only occasion for application of section 473 is where a party is unexpectedly placed in a situation to his injury without fault or negligence of his own and against which ordinary prudence could not have guided. (*Hearn v. Howard* (2009) 177 Cal.App.4th 1193, 1206.) Here, plaintiffs were notified by Mr. Hentschel of the amount of the sale price and that if they were unhappy they could seek an appraisal. This was on January 25, 2012 -- three months before the April 23, 2012, hearing on the motion to confirm the sale. Mr. Shalaby took over the case for plaintiffs on March 12, 2012 -- more than a month before the hearing on the motion to confirm the sale. Plaintiffs did not seek out an appraiser until after the hearing. Plaintiffs' characterization of their new lawyer's "race[] against time" to review a "decade-old court file" does not excuse plaintiffs' failure to seek an appraiser until after the hearing. It was plaintiffs' complaint all along that the offer was too low. Their failure to seek an appraisal earlier was not excusable.

Plaintiffs argue the trial court abused its discretion by considering untimely and unserved oppositions to the section 473 motion. We disregard this point, which is unsupported by citation to the record. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979.) Moreover, our conclusion that there are no grounds for reversal is not based on the oppositions to the section 473 motion, but upon the deficiency of plaintiffs' own showing in their moving papers.

---

**30** The trial court did have jurisdiction to hear the new trial motion heard after the June 8, 2012, section 473 motion. (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 191 ["a motion for a new trial is collateral to the judgment and may proceed despite an appeal from the judgment"].)

Plaintiffs argue they should have had control to decide the "fate" of their lawsuit. They cite no authority supporting their position. The fate of their lawsuit was decided by the May 2011 interlocutory judgment, from which plaintiffs did not timely appeal. Although their April 27, 2012, notice of appeal purported to appeal from the May 2011 interlocutory judgment, it was too late, as noted by the Kittermans. (Cal. Rules of Court, rule 8.104(a)(3); see fn. 6, *ante*.)

Plaintiffs are not entitled to section 473 relief.

## VII.  Motion For Sanctions

The Kittermans move for sanctions for a frivolous appeal filed to cause delay, under section 907 and California Rules of Court, rule 8.276.  Section 907 states:  "When it appears to the reviewing court that the appeal was frivolous or taken solely for delay, it may add to the costs on appeal such damages as may be just."  Rule 8.276 provides in pertinent part:  "(a) **Grounds for sanctions**  On motion of a party or its own motion, a Court of Appeal may impose sanctions, including the award of denial of costs under rule 8.278, on a party or an attorney for:  [¶]  (1) Taking a frivolous appeal or appealing solely to cause delay;  [¶]  (2) Including in the record any matter not reasonably material to the appeal's determination;  [¶]  (3) Filing a frivolous motion; or  [¶]  (4) Committing any other unreasonable violation of these rules."

The Kittermans seek a total of $48,450 in sanctions.

An appeal is frivolous only when:  (1) it is prosecuted for an improper motive, to harass the respondent or delay the effect of an adverse judgment or where it indisputably has no merit; or (2) any reasonable attorney would agree that the appeal is totally and completely without merit. (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650; *Personal Court Reporters, Inc. v. Rand* (2012) 205 Cal.App.4th 182, 191.)  The first standard is tested subjectively, with the focus on the good faith of the appellant and counsel. (*Personal Court Reporters, Inc.*, at p. 191.)  The second is tested objectively. (*Ibid*.)  While each of the two standards provide independent authority for a sanctions

44

award, in practice the two standards usually are together, with one providing evidence of the other, e.g., a total lack of merit is evidence that the appeal was filed only for delay. (*Ibid.*)

Here, we will not say the appeal is totally and completely without merit, because there were irregularities in variance with the statutory procedures, e.g., the referee's use of plaintiffs' lawyer in violation of section 873.120, subdivision (c).

The motion for sanctions is denied.

## DISPOSITION

The trial court's orders are affirmed. The Kittermans' motion for sanctions is denied.

          MURRAY         , J.

We concur:

      BLEASE        , Acting P. J.

      DUARTE        , J.